# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**MELINDA C.,[1]**

    **Plaintiff,**

  v.

**COMMISSIONER OF
SOCIAL SECURITY,**

    **Defendant.**

Civil Action 2:22-cv-1729
Magistrate Judge Elizabeth P. Deavers

## OPINION AND ORDER

Plaintiff, Melinda C., brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits. This matter is before the Court for on Plaintiff's Statement of Errors (ECF No. 8), the Commissioner's Memorandum in Opposition (ECF No. 11), Plaintiff's Reply (ECF No. 12), and the administrative record (ECF No. 7). For the reasons that follow, the Court **REVERSES** the Commissioner of Social Security's nondisability finding and **REMANDS** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## I. BACKGROUND

Plaintiff protectively filed her application for benefits on July 9, 2019, alleging that she has been disabled since July 9, 2011,[2] due to migraines, pustular psoriasis, depression with anxiety, type II diabetes, and kidney stones. (R. at 184-185, 210.) Plaintiff's application was denied initially in October 2019 and upon reconsideration in January 2020. (R. at 84-104, 107-

---

[1] Pursuant to General Order 22-01, due to significant privacy concerns in social security cases, any opinion, order, judgment or other disposition in social security cases in the Southern District of Ohio shall refer to plaintiffs only by their first names and last initials.

[2] Plaintiff amended her alleged onset date of disability to January 26, 2017. (R. at 227, 260.)

122.)  Plaintiff sought a *de novo* hearing before an administrative law judge.  (R. at 123-124.)  Administrative law judge Kathleen Kadlec (the "ALJ") held a telephone hearing on October 28, 2020, at which Plaintiff, who was represented by counsel, appeared and testified.  (R. at 51-83.)  A vocational expert ("VE") also appeared and testified.  (*Id.*)  On December 1, 2020, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 25-49.)  The Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 14-19.)

**II.    RELEVANT RECORD EVIDENCE**

   **A.  Relevant Hearing Testimony**

   The ALJ summarized Plaintiff's relevant hearing testimony as follows:

> [Plaintiff] testified that she stopped working in January 2017 and was working for a children's hospital in their trauma program as the administrative assistant. [Plaintiff] testified that her career has primarily been working healthcare doing administrative support, doing what she described as typical administrative work like scheduling meetings, ordering supplies, and answering phones. [Plaintiff] testified that migraines are the main reason she cannot work. She said she took medical leave and requested short-term disability, but was not approved. Instead, she was offered accommodations that she did not feel were practical for her position. She said that she felt no one would hire her due to how often she would be absent from work. [Plaintiff] stated that she is on an abortive medication, but she only gets six pills a month. [Plaintiff] stated that she has tried most treatments available, including Botox for two years. [Plaintiff] testified that most recently, she has tried an occipital nerve block, but that was not effective. [Plaintiff] indicated that the next step offered was cutting the occipital nerve, and she is not ready to try invasive treatments just yet. [Plaintiff] testified that she also gets depression, but the medications do not help. She denied doing any household chores.

(R. at 34.)

   **B.    Relevant Medical Records**

   The ALJ summarized the relevant medical records as follows:

> [Plaintiff] initially requested FMLA for her migraines in March 2016. At this time, [Plaintiff] was taking Percocet, Effexor, promethazine, and gabapentin. She was

also prescribed Zomig, a triptan, as a treatment for stopping migraines, with six pills in one prescription, and was trying Botox. In July, [Plaintiff] reported that the Botox was not helping, but skipping periods had helped somewhat. She had not started an exercise program. In December 2016, [Plaintiff's] primary care doctor, Patricia Toohey, M.D. noted that [Plaintiff] had a poor attitude and it was interfering with her meeting her goals. However, she was walking and staying away from fast food. Dr. Toohey also indicated that [Plaintiff's] migraines had increased with stress.

*** In July 2017, [Plaintiff] reported increased migraines with less activity and poor sleep hygiene, but she was in no acute distress. By October 2017, [Plaintiff] had increased her exercise and reported that her migraines were generally stable. In November 2017, [Plaintiff] was recovering from pneumonia and was having non-migraine headaches. Even during this recovery period, she was in no acute distress. About a week later, she reported that she felt better and was sleeping well. In June 2018, [Plaintiff] had experienced menopause and reported that her headaches had improved. She stated that she was eating better, but was not drinking enough water. She had returned to exercising.

*** [Plaintiff] presented to the emergency department on November 10, 2018 with complaints of a headache. She reported a headache starting two weeks ago and taking her medications without relief. She had gone to urgent care and was referred to the emergency department for further treatment. [Plaintiff] was able to touch chin to chest and turn her head to the right and left without difficulty. [Plaintiff] was given a migraine cocktail and indicated that this completely relieved her headache. On December 13, 2018, she returned to primary care complaining of a headache, but had developed sinusitis. Despite the sinus infection, [Plaintiff] was not in acute distress. [Plaintiff] continued to complain of persistent headaches on December 31, 2018, but Dr. Toohey noted that she was pleasant and not in acute distress. [Plaintiff] was instructed to start Lunesta and instructed on sleep hygiene as she stated that she took her iPad to bed with her. She reported tension headaches more than migraine headaches.

[Plaintiff] initially discussed wanting to go on disability on March 20, 2019, stating that she had tingling in her fingers and toes, was not dropping anything, but had no change in headaches, or neck or back pain. [Plaintiff] stated that primarily she wanted to go on disability due to headaches. Nonetheless, she was exercising consistently, eating a better diet, and had a normal neurological exam. Dr. Toohey referred [Plaintiff] for testing for the neuropathy with a physical medicine and rehabilitation doctor. On April 1, 2019, [Plaintiff] told Dr. Toohey that she wanted to go on disability because of her psoriasis and failing all the migraine medications. She was not in acute distress, and indicated that she was going to start a walking routine. She presented for an EMG on April 9, 2019, which revealed normal peripheral nerve function. PMR physician James Natalie, III, M.D. indicated a possibility of small-fiber neuropathy due to a thyroid problem or some other

3

condition. He did not suggest any symptom management or an MRI. Aside from slightly brisk reflexes, [Plaintiff] was pleasant, had a normal gait, sensation, and strength, normal range of motion, and negative straight leg raising. Dr. Natalie recommended a good multivitamin.

*** [Plaintiff] met with her neurologist Martin Taylor, D.O. on December 6, 2019, for further follow up with migraines. [Plaintiff] complained of head pain all the time, focused mostly on the right side of her head. She also had light and sound sensitivity with nausea up to five times per month. Dr. Taylor indicated that in addition to the medications described above, [Plaintiff] was taking a beta blocker daily for migraines and Excedrin extra strength three times per week. The physical exam revealed a decreased range of motion in the cervical spine, and a head tilt to the right with pain to palpation over the right side. The neurological exam was within normal limits. He referred [Plaintiff] for MRIs and did not believe adding medicine was appropriate as [Plaintiff] was already taking many medications. The brain MRI was normal. However, the cervical spine MRI revealed bulging discs, nerve root abutment, and stenosis. Upon return to Dr. Taylor on January 27, 2020, [Plaintiff] had significant pain in the right occipital region. He performed diagnostic/therapeutic nerve blocks and instructed to use a headache calendar.

[Plaintiff] reported a migraine during her psychiatric admission in June 2020. [Plaintiff] reported that she had photophobia and nausea. She was using Neurontin for pain and also had a medical marijuana card. On June 29, 2020, [Plaintiff] followed up with Dr. Taylor and reported having a headache all the time. [Plaintiff] reported only a two-day response with the occipital nerve blocks. Dr. Taylor discussed the remaining options with [Plaintiff], which included occipital ablation, a GammaCore device to use over the vagus and occipital nerves, or a CGRP inhibitor. [Plaintiff] was instructed to consider her options and return to Dr. Taylor as needed. [Plaintiff] testified that she had elected not to go forward with the ablation. [Plaintiff] has primarily alleged that stress and weather are triggers, both of which are easily avoidable. At the hearing, she testified that the accommodations offered, such as working in a darkened area or putting her head down, were not effective. This suggests that these work accommodations (to limiting light or an allowance for off-task time to allow [Plaintiff] to put her head down) are not supported.

[Plaintiff's] mental health symptoms also contribute to her migraines, as she has alleged that stress is a trigger. [Plaintiff] was on psychiatric medications prior to the amended alleged onset date, reporting anxiety, depression, and agitation on December 7, 2016. As indicated above, Dr. Toohey noted that [Plaintiff] did not have a good attitude. [Plaintiff's] medications were switched from Effexor to an increasing dose of Prozac as well as Wellbutrin. [Plaintiff] was referred to therapy. [Plaintiff] made no changes, but complained of side effects on December 19, 2016, and was switched to Pristiq and Xanax instead of Prozac and Effexor.

> On July 19, 2017, [Plaintiff] told Dr. Toohey that she was not having stress, but was unable to sleep, had no motivation, and had extreme fatigue. She was taking vistaril/hydroxyzine, but felt that this might be contributing to her fatigue. She stated that she was unable to sleep at night and wanted to sleep all day. Dr. Toohey suggested that [Plaintiff] increased her activity level, prescribed melatonin, increased amitriptyline, and stopped vistaril. October 2017, [Plaintiff] reported that her mood had improved with watching her grandchild. She stated that this made her feel good and happy. ***
>
> In June 2018, she said her mood was stable. She indicated that she was not feeling "great", but thought this was related to her recent psoriasis condition. The mental status exam was within normal limits.
>
> On December 31, 2018, [Plaintiff] reported a PHQ-9 score of 10, indicating moderate depression. She stated that she was having anxiety, irritability, problems sleeping, and fatigue. Dr. Toohey instructed [Plaintiff] to have better sleep hygiene and increase her Pristiq. As indicated above, [Plaintiff] was pleasant during this exam despite her complaints. This improved by March 2019, and [Plaintiff] reported an overall PHQ-9 score of 6. As noted above, [Plaintiff] reported exercising consistently and eating better diet. She reported that she was seeing psychiatry and had started trazodone.

(R. at 35-38 (internal citations omitted).)

### III. ADMINISTRATIVE DECISION

On December 1, 2020, the ALJ issued her decision. (R. at 25-49.) First, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2022. (R. at 30.) Then, at step one of the sequential evaluation process,[3] the ALJ found that

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

    1.    Is the claimant engaged in substantial gainful activity?

    2.    Does the claimant suffer from one or more severe impairments?

    3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

    4.    Considering the claimant's residual functional capacity, can the claimant perform

Plaintiff had not engaged in substantial gainful activity since January 26, 2017, the amended alleged onset date. (*Id.*) The ALJ then found that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine; degenerative disc disease of the cervical spine, migraines; depression; and anxiety. (*Id.*) The ALJ further found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 31.)

Before proceeding to step four, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, the [ALJ] finds that [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can operate foot controls occasionally and hand controls frequently. [Plaintiff] can occasionally reach overhead and frequently reach to the left, handle, finger, and feel. She can climb ramps and stairs, stoop, kneel, crouch, and crawl frequently, but can only occasionally climb ladders, ropes, or scaffolds. [Plaintiff] can never work at unprotected heights; and can work around moving mechanical parts, operate a motor vehicle, and be in vibration occasionally. She can work in moderate noise environments. She can perform simple, routine and repetitive tasks and make simple, work-related decisions.

(R. at 33-34.) At step four of the sequential process, the ALJ determined that Plaintiff is unable to perform her past relevant work as an administrative assistant. (R. at 42.) Relying on the VE's testimony, the ALJ concluded at step five that Plaintiff can perform other jobs that exist in

---

        his or her past relevant work?

    5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

6

significant numbers in the national economy, such as a marker, bagger or office cleaner. (R. at 43-44.) She therefore concluded that Plaintiff has not been disabled since January 26, 2017. (R. at 44.)

## IV. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices [Plaintiff] on the merits or deprives [Plaintiff] of

a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

V.  **ANALYSIS**

Plaintiff raises two issues in her statement of errors: (1) that the ALJ failed to properly consider the opinion of Plaintiff's primary care physician, Patricia Toohey, M.D., and failed to adequately provide any analysis for rejecting the restrictions which Dr. Toohey assessed; and (2) that the ALJ's RFC is not supported by substantial evidence. (ECF No. 8 at PAGEID ## 1142-1147.) As discussed below, the Court finds Plaintiff's first assignment of error to be well taken. This finding obviates the need for in-depth analysis of the remaining issue. Thus, the Court need not, and does not, resolve the alternative basis that Plaintiff asserts support reversal and remand. Nevertheless, on remand, the ALJ may consider Plaintiff's other arguments if appropriate.

In her first assignment of error, Plaintiff argues that "the ALJ failed to properly consider the opinion of Plaintiff's primary care physician, [Dr. Toomey]." (ECF No. 8 at PAGEID # 1143.) Plaintiff specifically points to a certification of serious health condition form regarding Plaintiff that Dr. Toohey completed on December 7, 2016, approximately one month prior to Plaintiff's amended alleged onset date. (*Id.*) Plaintiff argues that in that opinion, Dr. Toohey "noted that Plaintiff's medical condition of migraines had an onset of ten years prior and was expected to be a lifelong condition"; "noted that Plaintiff's migraines persisted despite treatment with prescription medication and that Plaintiff was unable to perform any job duties during migraine flareups"; and "opined that Plaintiff's migraines caused episodic flareups periodically which prevented Plaintiff from participating in normal daily act." (*Id.* (citing R .at 447-449).) Plaintiff submits, however, that "[t]he ALJ's decision makes no reference to the persuasiveness of the opinions proffered by Dr. Toohey," and argues that "[t]he ALJ's failure . . . runs afoul of

the governing regulations." (*Id.* at PAGEID # 1144.) Plaintiff argues this constitutes a "fatal flaw" in the ALJ's decision, and that the ALJ's error was not harmless. (*Id.* at PAGEID ## 1145-1146.)

In response, the Commissioner argues that "[Dr. Toohey's] statements do not constitute medical opinions" because Dr. Toohey opined on issues reserved to the Commissioner, such as whether Plaintiff was disabled or unable to work. (ECF No. 11 at PAGEID # 1162.) Therefore, according to the Commissioner, "[t]he ALJ correctly disregarded these and other providers' statements as not probative, not valuable, and thus, not persuasive." (*Id.*) The Commissioner then continues, however, to argue that "the ALJ was well within her authority to disregard [Dr. Toohey's] statements" because they were "conclusory," and that "even if the Court finds [Dr. Toohey's statements] constituted opinions, any error in this regard is harmless because the ALJ indirectly addressed them through her analysis of other evidence." (*Id.* at PAGEID ## 1162-1164.) The Commissioner further argues that Dr. Toohey's statements, which were made before Plaintiff's amended alleged disability date, "have little probative value and limited relevance," and that "[t]he ALJ's medical evidence evaluation further illustrates how Dr. Toohey's statements were wholly inconsistent with and unsupported by evidence, including Dr. Toohey's own treatment records." (*Id.* at PAGEID # 1164.) The Commissioner concludes that "[b]ecause the ALJ's opinion analysis was supported by substantial evidence the court should affirm." (*Id.* at PAGEID # 1166.)

In her Reply brief, Plaintiff argues that "[t]his is a case involving an ALJ's noncompliance with 20 C.F.R. § 404.1520c(b)(2)," and that "[e]ven if the ALJ's decision meets the substantial evidence standard, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices [Plaintiff] on the merits or

9

deprives [Plaintiff] of a substantial right." (ECF No. 12 at PAGEID ## 1172-1173 (internal citations omitted).) Plaintiff also specifically responds to the Commissioner's brief by arguing that the Commissioner "offers no meaningful response to the ALJ's failure to properly consider the opinion but instead provides impermissible post-hoc rationalizations." (*Id.* at PAGEID # 1173.)

A claimant's RFC is an assessment of "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). An ALJ must assess a claimant's RFC based on all the relevant evidence in a claimant's case file. *Id*. The governing regulations[4] describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings. 20 C.F.R. §§ 404.1513(a)(1)–(5); 416.913(a)(1)–(5). Objective medical evidence is defined as "medical signs, laboratory findings, or both." 20 C.F.R. §§ 404.1513(a)(1); 416.913(a)(1). "Other medical evidence is evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of your impairments, your medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." 20 C.F.R. §§ 404.1513(a)(3); 416.913(a)(3). "Medical opinion" is defined as follows:

> (2) Medical opinion. A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions . . . .
>
>> (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other

---

[4] Plaintiff's application was filed after March 27, 2017. (R. at 270-282.) Therefore, it is governed by revised regulations redefining how evidence is categorized and evaluated when an RFC is assessed. *See* 20 C.F.R. §§ 404.1513(a), 404.1520c (2017).

> physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> (ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>
> (iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
>
> (iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. §§ 404.1513(a)(2); 416.913(a)(2).

The governing regulations include a section entitled "[h]ow we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017." 20 C.F.R. §§ 404.1520c; 416.920c. These regulations provide that an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a). Instead, they provide that an ALJ will consider medical source opinions and prior administrative findings using five factors: supportability, consistency, relationship of source to claimant, specialization, and other factors tending to support or contradict a medical opinion or prior administrative medical finding. 20 C.F.R. §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5).

The regulations explicitly indicate that the "most important factors" to consider are supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2); 416.920c(b)(2). Indeed, the regulations *require* an ALJ to "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings" in a benefits determination or decision and allows that the ALJ "may, but [is] not required to, explain

11

how [they] considered" the other factors. *Id.* If, however, two or more medical opinions or prior administrative medical findings are equal in supportability and consistency "but are not exactly the same," an ALJ must also articulate the other most persuasive factors. 20 C.F.R. §§ 404.1520c(b)(3); 416.920c(b)(3). In addition, when medical sources provide multiple opinions or multiple prior administrative findings, an ALJ is not required to articulate how he evaluated each opinion or finding individually but must instead articulate how he considered the opinions or findings from that source in a single analysis using the five factors described above. 20 C.F.R. §§ 404.1520c(b)(1); 416.920c(b)(1). Finally, the regulations explain that the SSA is not required to articulate how it considered evidence from non-medical sources. 20 C.F.R. §§ 404.1520c(d); 416.920c(d).

The applicable regulations provide the following guidance for how ALJs should evaluate the "supportability" and "consistency" of medical source opinions:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. § 404.1520c(c)(1)-(2); 416.920c(c)(1)-(2). In practice, this means that the "supportability" factor "concerns an opinion's reference to diagnostic techniques, data collection procedures/analysis, and other objective medical evidence." *Reusel v. Comm'r of Soc. Sec.*, No. 5:20-CV-1291, 2021 WL 1697919, at *7 n.6 (N.D. Ohio Apr. 29, 2021) (citing SSR 96-2p, 1996 SSR LEXIS 9 (July 2, 1996) (explaining supportability and inconsistency); 20 C.F.R. § 404.1527(c)(3), (4) (differentiating "supportability" and "consistency"); 20 C.F.R. §

12

404.1520c(c)(1), (2) (further clarifying the difference between "supportability" and "consistency" for purposes of the post-March 27, 2017 regulations)).

Against that backdrop, the ALJ acknowledged that Dr. Toohey was Plaintiff's long-time primary care physician, and even discussed the subject serious health condition form regarding Plaintiff that Dr. Toohey completed on December 7, 2016:

> In December 2016, the claimant's primary care doctor, Patricia Toohey, M.D. noted that the claimant had a poor attitude and it was interfering with her meeting her goals. However, she was walking and staying away from fast food. Dr. Toohey also indicated that the claimant's migraines had increased with stress.
>
> ***
>
> The claimant's mental health symptoms also contribute to her migraines, as she has alleged that stress is a trigger. The claimant was on psychiatric medications prior to the amended alleged onset date, reporting anxiety, depression, and agitation on December 7, 2016. As indicated above, Dr. Toohey noted that the claimant did not have a good attitude. The claimant's medications were switched from Effexor to an increasing dose of Prozac as well as Wellbutrin. The claimant was referred to therapy.

(R. at 35, 37 (internal citations omitted). Plaintiff is correct, however, that he ALJ did ***not*** discuss Dr. Toohey's serious health condition form as a medical opinion, let alone discuss its persuasiveness or assign it any specific evidentiary weight.

This constituted error. While the Commissioner submits that Dr. Toohey "largely checked boxes" and made "hazy pronouncements about the effectiveness of [Plaintiff's] medication," a closer examination of Dr. Toohey's report reveals a number of statements which are in fact "medical opinions" under the applicable regulations. (ECF No. 11 at PAGEID # 1162.) First, for example, Dr. Toohey opined that Plaintiff's migraines can cause episodic flareups "at any time" which inhibit Plaintiff's ability to perform both her "job functions" and "normal daily activities." (R. at 448-449.) For this reason, Dr. Toohey opined that it would be

13

medically necessary for Plaintiff to be absent from work during such flareups, which could be as frequently as up to fifteen (15) days per month and between one hour and two days per flareup – which, again, Dr. Toohey opined could happen "at any time." (*Id.*) Finally, Dr. Toohey opined that Plaintiff sometimes responds well to prescription medication and sleep, but that she would need to continue to have treatment visits at least twice per year due to the condition. (*Id.*)

The Commissioner argues that Dr. Toohey's opinions, which were made before Plaintiff's amended alleged disability date, "have little probative value and limited relevance," and that "[t]he ALJ's medical evidence evaluation further illustrates how Dr. Toohey's statements were wholly inconsistent with and unsupported by evidence, including Dr. Toohey's own treatment records." (*Id.* at PAGEID # 1164.) But these are not the ALJ's articulated reasons for discrediting Dr. Toohey's opinion – they are the Commissioner's *post hoc* arguments. And the question is not whether the Court can justify the ALJ's conclusion, it is if the ALJ's decision "was made pursuant to proper legal standards.'" *Rabbers*, 582 F.3d at 651. To this end, the ALJ had a duty to evaluate the persuasiveness of Dr. Toohey's opinion, but she simply did not do so. 20 C.F.R. § 404.1520c(b) ("**We will articulate in our determination or decision how persuasive we find all of the medical opinions** and all of the prior administrative medical findings in your case record.") (emphasis added).

The ALJ's error was not harmless. *See Andrew M. v. Comm'r of Soc. Sec.,* No. 1:20-CV-906, 2022 WL 683457, at *6 (S.D. Ohio Mar. 8, 2022) (finding that "[t]he error to articulate the analysis of 'supportability' and to fully articulate the analysis of the 'consistency' factor is not harmless."). Indeed, as Plaintiff correctly observes, the VE testified during the administrative hearing regarding what was acceptable for time off task and absenteeism:

> Usually time off task is permitted up to including 10% and anything above that would preclude competitive work. Absenteeism is permitted no more than one day a month, so anything above one day generally in my experience would preclude competitive employment.

(R. at 79.) This testimony directly implicates Dr. Toohey's opinion, because if the ALJ found Dr. Toohey's opinion to be persuasive then the ALJ may have found that Plaintiff's migraines precluded competitive employment. Yet the ALJ remained silent on the issue, and in so doing, prevented this Court from conducting a meaningful review. *See Angela R. v. Comm'r of Soc. Sec.*, No. 2:20-CV-6322, 2022 WL 2167545, at *8 (S.D. Ohio June 16, 2022), *report and recommendation adopted*, No. 2:20-CV-6322, 2022 WL 2486980 (S.D. Ohio July 6, 2022) ("[I]f the ALJ intended to reject the opinion that Plaintiff would "miss work about two days per month," he did not do so in a way that is clear to the Court. Such failure constitutes reversible error.") (citing cases).

Given this, it is well settled that the ALJ's failure to discuss the persuasiveness of Dr. Toohey's opinion requires remand, because "without fuller explanation, this court cannot engage in meaningful review of the ALJ's decision." *Jacob B. v. Comm'r of Soc. Sec.*, No. 1:20-CV-617, 2022 WL 130761, at *8 (S.D. Ohio Jan. 14, 2022) ("In the absence of a sufficient explanation of supportability and consistency with the record as a whole, the Court cannot conclude that the ALJ's consideration of [a medical opinion] is supported by substantial evidence . . . . Accordingly, the ALJ's decision must be reversed and remanded for further proceedings to properly analyze [the] medical opinions pursuant to 20 C.F.R. § 404.1520c."). Accordingly, Plaintiff's first assignment of error is well taken, and the judicial inquiry ends.

## VI. CONCLUSION

Based on the foregoing, Plaintiff's Statement of Errors (ECF No. 8) is **GRANTED**. The decision of the Commissioner is therefore **REVERSED** and this action is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings. The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in this case pursuant to sentence four of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**

**DATED: September 20, 2022**      /s/ *Elizabeth A. Preston Deavers*
**ELIZABETH A. PRESTON DEAVERS**
**UNITED STATES MAGISTRATE JUDGE**